[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10597
Non-Argument Calendar
_____

D.C. Docket No. 0:09-cr-60042-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CINDY MORAN-SANCHEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 13, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and WILSON, Circuit Judges.

PER CURIAM:

Cindy Moran-Sanchez was employed as a Customs and Border Patrol (CBP) Officer when she conspired to use her government position and contacts to smuggle cocaine and heroin into the United States. She appeals the denial of her motion for a sentence reduction based on Amendment 782 to the sentencing guidelines.

I.

The factual statement attached to Moran-Sanchez's plea agreement tells the story of her crime. In February 2005, she traveled to the Dominican Republic to meet with Juan Baez, a convicted felon who had recently been deported from the United States. Less than one year later, in September 2006, she began her employment as a CBP Officer in the Miami International Airport. At the time, Moran-Sanchez's husband and sister worked at Fort Lauderdale International Airport — he as a Transportation Security Administration Officer and she as a CBP Officer.

On June 28, 2006, Moran-Sanchez traveled again to the Dominican Republic to meet Baez, this time with her husband and sister along for the trip. While there, the group formed a plan to smuggle drugs into the United States. They agreed that Baez would reenter the country using the false identity "Anibal Acosta" and that he would recruit couriers to travel back and forth between the two countries with the illegal narcotics. Moran-Sanchez, her husband, and her sister would use their

2

government positions and contacts to assist Baez with his illegal reentry and then assist the couriers with passing through customs and TSA checkpoints with the narcotics. Moran-Sanchez provided Baez with information related to the manner in which the couriers should dress, the days on which they should travel, and the best way to purchase their tickets to decrease the likelihood of detection. The group agreed that Baez would pay a fee to his co-conspirators, including Moran-Sanchez, for each kilogram of narcotics successfully smuggled into the United States.

Baez reentered the United States using the identity of "Anibal Acosta" on September 17, 2006. He then recruited a drug courier by the name of David Rosario. He provided Rosario's name to Moran-Sanchez, who in turn provided it to her sister. Baez and Moran-Sanchez discussed dates on which Rosario would attempt to enter the United States through the Fort Lauderdale International Airport, and she agreed to coordinate the shipment of the narcotics by commercial carrier to New York. On April 22, 2007, Rosario was arrested attempting to enter the United States with a suitcase containing 16.1 kilograms of heroin. Moran-Sanchez informed Baez that Rosario had been arrested and the narcotics seized.

Moran-Sanchez was arrested and charged with knowingly conspiring to import controlled substances — five kilograms or more of a substance containing a detectable amount of cocaine, and one kilogram or more of a substance containing

a detectable amount of heroin — in violation of 21 U.S.C. §§ 952(a) and 963. She pleaded guilty.

The Presentence Investigation Report (PSR) calculated an adjusted offense level of 37 and a criminal offense category of I, resulting in an advisory guidelines range of 210 to 262 months imprisonment. The district court sustained Moran-Sanchez's unopposed objection to the PSR's drug quantity calculation, which reduced the adjusted offense level to 35 and the advisory guidelines range to 168 to 210 months imprisonment.

In addition to the drug quantity objection, Moran-Sanchez moved for a downward departure pursuant to U.S.S.G. § 5K2.13 (diminished mental capacity). At her sentence hearing on September 21, 2010, Moran-Sanchez argued that she was vulnerable to Baez's corruption because she suffered from posttraumatic stress disorder after many years of physical and sexual abuse at the hands of her mother, a family friend, and her husband. The government responded with evidence showing that Moran-Sanchez was actually "the driving force" behind the conspiracy and the "boss" of her co-conspirators, and that she had a "longstanding relationship" with Baez. It introduced a recording of Moran-Sanchez "yelling at [Baez]," "questioning him," and "frisking him to see if he was wearing a wire." The government further argued that even if posttraumatic stress disorder had impacted Moran-Sanchez's reasoning abilities, she had failed to establish a "causal

4

connection" between it and the crime. The district court denied the motion for a downward departure, finding that Moran-Sanchez's "ability to reason was not compromised in any way as a result of any form of mental defect."

The court then heard argument on the § 3553(a) factors. Moran-Sanchez maintained, contrary to the government's assertions, that her role in the conspiracy was minimal. She asserted that a downward variance was appropriate because it would bring her sentence in line with those of her "equally culpable" husband and sister. In response, the government reiterated its position that Moran-Sanchez was "more culpable" than her sister and her husband. Even before this particular conspiracy, the government noted, she was a "longstanding drug partner[]" of Baez. And during this conspiracy, Moran-Sanchez spoke to Baez on the phone 621 times. By comparison, her sister and husband spoke to him only 13 and 11 times, respectively. The government asserted that Moran-Sanchez "corrupted her sister and . . . her husband" and then "use[d] their positions as United States officers to corrupt and circumvent the system." The government also noted that Moran-Sanchez, while a CBP Officer, had aided and abetted at least two aggravated felons with illegal reentry.

The court sentenced Moran-Sanchez to 168 months imprisonment — the low end of the advisory guidelines range — followed by 5 years supervised release. The court stated that it had considered the § 3553(a) factors and that the

sentence imposed was necessary "to provide just punishment and to afford adequate deterrence to future criminal conduct, not only by this defendant, but by others."

Moran-Sanchez appealed. Her counsel filed a motion to withdraw as counsel, supported by an Anders brief. Anders v. California, 386 U.S. 738, 87 S. Ct. 1396 (1967). We granted the motion and affirmed Moran-Sanchez's conviction and sentence, concluding that "examination of the entire record reveal[ed] no arguable issues of merit." United States v. Moran-Sanchez, No. 10-14648 (11th Cir. Aug. 3, 2011).

On September 10, 2014, Moran-Sanchez filed a § 3582(c)(2) motion to reduce her sentence based on Amendment 782 to the sentencing guidelines, which lowered the penalties for most drug offenses by reducing offense levels on the § 2D1.1 drug quantity table. She argued that the court should reduce her sentence because she had strong family ties and had participated in extensive post-sentencing rehabilitation and training. The government conceded that Amendment 782 was applicable to Moran-Sanchez's case and noted that the correct advisory guidelines range, once the 2-level reduction was applied, was 135 to 168 months. But it argued that the § 3553(a) factors did not support a sentence reduction.

6

In its order denying Moran-Sanchez's motion, the district court agreed with the government that Amendment 782 applied and also that the § 3553(a) factors weighed against a sentence reduction. The court explained:

> The history and characteristics of the Defendant and the nature and circumstances of the offense strongly militate against a reduction of her sentence. She utilized her position as a [CBP] Officer, her sister's position as a [CBP] Officer, and her husband's position as a TSA supervisor to import heroin into the United States. In addition, Mrs. Moran-Sanchez aided and abetted the illegal entry into the United States of aliens. She engaged in this conduct for approximately three years. The Court finds no mitigation here.

This is Moran-Sanchez's appeal.

## II.

"We review a district court's decision whether to reduce a sentence pursuant to 18 U.S.C. § 3582(c)(2), based on a subsequent change in the sentencing guidelines, for abuse of discretion." United States v. Brown, 332 F.3d 1341, 1343 (11th Cir. 2003). Once it is determined that an amendment to the sentencing guidelines is applicable to the incarcerated defendant, a district court must follow a two-part analysis. United States v. Bravo, 203 F.3d 778, 780 (11th Cir. 2000). First, the court must recalculate the defendant's sentence by "substituting the amended guideline range for the originally applied guideline range." Id. Second, the court must decide whether, in its discretion and in light of the § 3553(a) sentencing factors, it will impose the newly calculated sentence or retain the original sentence. Id. at 781. "The district court is not required to articulate the

7

applicability of each [§ 3553(a)] factor, as long as the record as a whole demonstrates that the pertinent factors were taken into account."   United States v. Williams, 557 F.3d 1254, 1256 (11th Cir. 2009) (quotation marks omitted).

Here, the court did not abuse its discretion in denying Moran-Sanchez's § 3582(c)(2) motion.  Although Amendment 782 altered Moran-Sanchez's original base offense level, we have explicitly rejected her suggestion that a district court must reduce a defendant's sentence pursuant to § 3582(c)(2) where a retroactive amendment lowers the guidelines range.  United States v. Vautier, 144 F.3d 756, 760 (11th Cir. 1998) ("The grant of authority to the district court to reduce a term of imprisonment [under § 3582(c)(2)] is unambiguously discretionary.").  The district court stated that it had considered the § 3553(a) factors and specifically identified "the history and characteristics of [Moran-Sanchez]" and "the nature and circumstances of the offense" as two factors that weighed heavily in favor of retaining the original sentence.

Moran-Sanchez asserts that the court erred by considering "information" that it had not considered during her original sentencing.   That assertion is not supported by the record.  And even if it were, that would not matter:  we have held that a resentencing court has discretion to consider information that it did not consider during the original sentencing.  See Williams, 557 F.3d at 1256 (stating

that a resentencing court may consider, among other things, a defendant's post-sentencing conduct).

**AFFIRMED.**